CONTROL DATA CORPORATION ET AL., APPELLANTS AND CROSS-APPELLEES, *v.* CONTROLLING BOARD OF OHIO ET AL., APPELLEES AND CROSS-APPELLANTS.

(No. 82AP-852—Decided
December 22, 1983.)

*Messrs. Bricker & Eckler, Mr. Russell Leach, Mr. Thomas E. Workman* and *Mr. Danny L. Cvetanovich,* for appellants and cross-appellees.

*Mr. Anthony J. Celebrezze, Jr.,* attorney general, and *Ms. Colleen K. Nissl,* for appellee and cross-appellant Controlling Board.

*Messrs. Vorys, Sater, Seymour & Pease, Mr. Edgar A. Strause* and *Mr. George Jenkins,* for appellee and cross-appellant General Instrument Corporation.

STRAUSBAUGH, J. This is an appeal by the plaintiffs, Control Data Corporation, William F. Bowen, Robert E. Netzley, and Thomas A. Van Meter, from a decision of the Court of Common Pleas of Franklin County refusing to grant the plaintiffs' request for declaratory and injunctive relief, and a cross-appeal by the defendants, the Ohio State Lottery Commission and its director, Edwin C. Taylor, the Ohio Department of Admin-

istrative Services and its director, William D. Keip, the Controlling Board of the state of Ohio and four of its members, George E. Lord, Stanley J. Aronoff, Cliff Skeen and William E. Hinig, and General Instrument Corporation, from the trial court's finding that the plaintiffs had standing to seek such relief. This dispute centers around a contract executed between the lottery commission and General Instrument Corporation for the purchase of computer equipment and for personal services needed for its maintenance and operations.

The plaintiff Control Data Corporation (hereinafter referred to as "CDC") is a Delaware corporation and is licensed to do business in the state of Ohio. CDC participates in the manufacturing, selling, leasing, operating and servicing of computerized on-line wagering systems. The plaintiffs Bowen, Netzley and Van Meter are citizens of the state of Ohio, duly elected members of the Ohio General Assembly and members of the Controlling Board.

On May 20, 1982 the State Lottery Commission submitted a request to waive the competitive bidding requirements for the purchase of computer equipment and to approve a contract with General Instrument Corporation (hereinafter referred to as "GIC") for the purchase and maintenance of the existing computer system which, at the time, was being leased from GIC. On June 22, 1982 the lottery commission's request was considered by the Controlling Board; however, the meeting ended in a three-to-three tie (with one member missing) and no approval was given. Van Meter, Bowen, and Netzley voted to deny the request. Immediately after the meeting, the lottery commission submitted an invitation to bid "(ITB") to the Department of Administrative Services ("DAS"), which was distributed on June 25, 1982. DAS then scheduled and conducted a pre-bid conference with pro-

spective bidders in Columbus on July 15, 1982. Based upon the lottery commission's ITB, all the vendors present at the pre-bid conference agreed that it would not be possible to bid upon and install a new system before the expiration of the contract with GIC. The lottery commission then decided to again submit its request to the Controlling Board.

On July 20, 1982 the lottery commission requested that the president of the Controlling Board, George E. Lord, place the lottery commission's request on the agenda for the Controlling Board's July 21 meeting. At the July 21 meeting, the request was reconsidered and passed by a vote of four to three. Once again, Van Meter, Bowen, and Netzley voted against the request. Later that day, the lottery director and GIC executed the contract.

On July 23, 1982 the plaintiffs brought an action against the state defendants asking that the contract between the State Lottery Commission and GIC be declared void, that the parties involved be enjoined from performing the contract, and that all state agencies involved in the contract negotiations and approval be enjoined from ignoring the law as it applies to their procedures. In addition, the plaintiffs brought a motion for a temporary restraining order and a motion for a preliminary injunction. Two days later, the plaintiffs amended their complaint to include GIC as a defendant. The plaintiffs based their lawsuit on the grounds that the defendants had failed to abide by the procedural requirements necessary for the waiver of competitive bidding and the approval of the contract with GIC, that the lottery commission abused its discretion in deciding to submit the request to the Controlling Board, and that the Controlling Board had abused its discretion in approving the lottery commission's request.

On the same day that the complaint was filed, the trial court issued a tem-

porary restraining order, scheduled a hearing on August 6, 1982 for plaintiffs' motion for a preliminary injunction, and consolidated the trial on the merits with the hearing. At the end of the proceedings on August 6, 1982 the trial court rescheduled the trial to resume on August 13, 1982. The trial was resumed and completed on August 13, 1982. A decision was rendered on August 24, 1982 in favor of the defendants with the trial court setting forth specific findings of fact and conclusions of law. Its judgment entry was filed on September 7, 1982, and on September 8, 1982 the trial court filed another entry correcting a mistake made in its previous decision. From this decision, both sides now appeal.

The plaintiffs raise the following seven assignments of error:

"1. The trial court's judgment is against the manifest weight of the evidence adduced at the trial of this case.

"2. The trial court's second conclusion of law, contained in its Decision, filed August 24, 1982 — upon which its judgment in this case is based — is erroneous.

"3. The trial court's third conclusion of law is erroneous.

"4. The trial court's fourth conclusion of law is erroneous.

"5. The trial court's fifth conclusion of law is erroneous.

"6. The trial court's sixth conclusion of law is erroneous.

"7. The trial court's seventh conclusion of law is erroneous."

On cross-appeal, the defendants raise the following single assignment of error:

"The trial court erred in holding that appellants maintained the requisite standing to bring this action."

In its first conclusion of law, the trial court stated:

"1. Plaintiffs have standing to bring this action."

The defendants in their cross-appeal cite this determination of the trial court as their single assignment of error. They contend that neither CDC nor the three dissenting members of the Controlling Board have the necessary standing to challenge the actions of the lottery commission and the Controlling Board in the approval and execution of the lottery commission's new contract with GIC. The plaintiff CDC claims standing, both as a prospective bidder and as a taxpayer, while the three dissenting members of the Controlling Board, Van Meter, Bowen, and Netzley, claim standing in their capacity as legislators and as taxpayers.

As stated by this court in *C. E. Angles, Inc.* v. *Evans* (Dec. 14, 1982), No. 82AP-635, unreported:

"The common law doctrine of standing to sue involves a determination of whether a party has a sufficient stake in the outcome of a justiciable controversy to obtain a judicial resolution of that controversy. * * *" *Id.* at 2.

With this basic rule in mind, two separate determinations must be made in regard to a plaintiff's standing. First, a justiciable controversy must exist, and, second, the plaintiff must have a sufficient stake in its outcome. As a prospective bidder, CDC claims that, as a result of the Controlling Board's approval of the lottery commission's request for waiver of the competitive bidding requirements and its approval of the new contract with GIC, it was unlawfully removed from competing for the contract and denied an opportunity to offer a bid. CDC seeks to have the lottery commission's contract with GIC declared void and to enjoin any further performance of that contract.

It is well-recognized that a corporation has standing to bring a suit if there is a justiciable controversy affecting it as a prospective or disappointed bidder seeking to enjoin the award of a contract and that contract's performance. See

*Angles, supra; State, ex rel. Connors,* v. *Ohio Dept. of Transp.* (1982), 8 Ohio App. 3d 44. Clearly, if the procedural requirements placed upon the lottery commission and Controlling Board were not substantially complied with, as alleged by the plaintiffs, then CDC may be entitled to the relief it seeks. Therefore, a justiciable controversy exists between CDC and the defendants.

CDC's stake in the outcome of this dispute lies in its status as a prospective bidder for the contract to supply computer equipment and services to the lottery commission. The Controlling Board's decision to waive the competitive bidding requirements applicable to the lottery commission's purchase of computer equipment, and the necessary professional services to maintain it, denied CDC any opportunity to bid on the contract and compete with GIC for the lottery funds. As such, CDC had a sufficient stake in the outcome of a justiciable controversy to allow it standing to bring an action for declaratory and injunctive relief.

As for Van Meter, Bowen, and Netzley, they claim, as legislators, that they have a sufficient stake in the outcome of a justiciable controversy for the reason that the effectiveness of their votes from the meeting on June 22, 1982, when the Controlling Board failed to approve the lottery commission's request, was unlawfully nullified by the subsequent actions of the Controlling Board in taking a second vote on the lottery commission's request, on July 21, 1982, and approving it.

The plaintiffs cite *Kennedy* v. *Sampson* (C.A.D.C. 1974), 511 F. 2d 430, in support of their claim. In *Kennedy,* Senator Edward Kennedy, who voted in favor of a piece of legislation which was subsequently vetoed by the President, brought an action challenging the veto as being improperly effected. The federal court of appeals for the District of Columbia Circuit found that an in-dividual legislator did have standing to protect the effectiveness of his vote.

However, the *Kennedy* decision is distinguishable from the instant case. The effectiveness of Senator Kennedy's vote was nullified by an allegedly improper presidential veto, in which he was not allowed to participate and had absolutely no control over its use. Here, the plaintiffs were active members of the Controlling Board and were given an adequate opportunity to participate in all matters brought before it, including the lottery commission's request when it was reconsidered on July 21. When a state agency's request is brought before the Controlling Board, neither the Controlling Board nor any of its members become a party to that request. It would be improper to consider a member of the Controlling Board as a person "aggrieved" when a decision of the Controlling Board is contrary to his personal opinion or the position for which his vote was cast. Sufficient representation of the public's interest could be provided by a citizen affected by the decision of the Controlling Board and not by allowing a member of the board to take a partisan position and challenge the outcome of the Controlling Board's proceedings. Therefore, Van Meter, Bowen, and Netzley do not have a sufficient stake in the outcome of a justiciable controversy as legislators to give them standing to bring suit against the defendants.

Bowen, Van Meter, and Netzley also claim that they have standing to bring their suit as taxpayers. The plaintiffs do not base their standing as taxpayers on any statutory authority. As stated by the Supreme Court, in the first paragraph of the syllabus of its decision, in *State, ex rel. Masterson,* v. *Ohio State Racing Comm.* (1954), 162 Ohio St. 366 [55 O.O. 215]:

"In the absence of statutory authority, a taxpayer lacks legal capacity to institute an action to enjoin the expenditure of public funds unless he has some

special interest therein by reason of which his own property rights are placed in jeopardy."·

Here, as in *Masterson,* a special fund is involved. R.C. 3770.06 provides:

"(A) There is hereby created the state lottery fund into which shall be deposited all revenues received from sales of lottery tickets and license fees. Moneys shall be disbursed from it on the order of the auditor of state, pursuant to vouchers or invoices signed by the director of the state lottery commission. The moneys in the state lottery fund shall be subject to appropriation by the general assembly. Total disbursements for monetary prize awards to holders of winning lottery tickets and purchases of goods and services awarded as prizes to holders of winning lottery tickets shall be of an amount equal, as nearly as is practicable, to forty-five per cent of the total revenue accruing from the sale of lottery tickets.

"(B) Whenever, in the judgment of the director of budget and management, the amount to the credit of the state lottery fund is in excess of that needed to meet the maturing obligations of the commission and as working capital for its further operations, the director of budget and management shall certify the amount of such excess to the commission and to the auditor of state. * * *"

From the language of R.C. 3770.06, it would appear that none of the expenditures used for the purchasing of operational equipment and services involves funds received from the General Revenue Fund, but, instead, comes from the revenues collected from the lottery itself. Nor have the plaintiffs offered any evidence showing that such expenditures are made from the General Revenue Fund. In addition, the plaintiffs do not claim to be in a special class of taxpayers from whom the lottery commission's revenues are collected. They merely claim standing as general taxpayers. Therefore, the plaintiffs have failed to meet the special ·interest requirements of *Masterson* and have no standing as taxpayers to bring their suit. Accordingly, the defendants' single assignment of error is sustained in part, and overruled in part.

In its second and third conclusions of law, the trial court states:

"2. All Defendants and other State Defendants have complied with all material procedural or other requirements, statutory or otherwise, applicable to the approval of the Lottery Request.

"3. All Defendants including State Defendants have substantially complied with all procedural or other requirements applicable to the approval of the Lottery Request and, if not, Plaintiffs have either waived these requirements or have failed to establish they were prejudiced or that Defendants' actions were unlawful."

The plaintiff CDC asserts that the defendants did not comply with all the procedural requirements that are necessary before the lottery commission's request for a waiver of competitive bidding for the purchase of computer equipment for the lottery could be granted and for the approval of a new service agreement with GIC for the maintenance and upkeep of that equipment. The granting of declaratory relief and the issuance of an injunction are matters of judicial discretion and, absent an abuse of discretion by the trial court, an appellate court is not permitted to question the trial court's decision to deny or grant such relief. *Perkins* v. *Quaker City* (1956), 165 Ohio St. 120 [59 O.O. 151]; *Bilyeu* v. *Motorists Mut. Ins. Co.* (1973), 36 Ohio St. 2d 35 [65 O.O.2d 179]. In the case at bar, the trial court refused to grant the declaratory and injunctive relief sought by the plaintiffs. The court found that all necessary procedural requirements had been substantially complied with and that the ap-

proval of the lottery commission's request was made within the lawful authority of the Controlling Board.

In order to reverse the decision of the trial court, it would be necessary to find that the defects, if any, that did occur in the procedures followed by the defendants, in seeking an approval of the lottery commission's request, were so substantial that for the trial court to state that all applicable procedures were substantially complied with was an abuse of discretion. Under such a standard, the defects that occur must be of such a character that they not only prejudice the rights of the plaintiff but are also so significant that they threaten the basic integrity of the Controlling Board and its procedures. If, of course, no substantial defect in the procedures can be found, then only the decisions by both the lottery commission and Controlling Board, in seeking the request and approving it, are left for examination.

As stated by the Supreme Court in *State, ex rel. Shafer,* v. *Ohio Turnpike Comm.* (1953), 159 Ohio St. 581, 590 [50 O.O. 465]:

"The rule is generally accepted that, in the absence of evidence to the contrary, public officers, administrative officers and public boards, within the limits of the jurisdiction conferred by law, will be presumed to have properly performed their duties and not to have acted illegally but regularly and in a lawful manner. * * *"

The plaintiff challenges the authority of the lottery commission to seek a waiver of the competitive bidding requirements and its authority to execute a contract with GIC for the purchase and maintenance of the existing computer system in use.

R.C. 125.06 states that:

"No elective or appointive state officer, board, or commission, other than those excepted in section 125.04 of the Revised Code, shall procure or purchase any supply or equipment or contract of insurance or make contracts for or operate data processing machine services other than from or through the department of administrative services. When the department determines that it is impractical for any officer, board, or commission to obtain any supply or equipment, or contract of insurance, or to contract for or operate data processing machine services from or through the department, it may issue to such officer, board, or commission a release and permit to secure such supply or equipment or contract of insurance or to contract for or operate data processing machine services other than from or through the department. * * *"

R.C. 125.07 requires that all equipment purchased by DAS, so long as the amount of the purchase is over $5,000 and the purchase is not made pursuant to R.C. 4115.31 and 4115.35, shall be purchased through competitive bidding. The lottery commission on its own could not acquire the equipment it sought to purchase from GIC without first receiving a release and permit from the DAS in accordance with R.C. 125.06. Even after such a release is granted, the lottery commission is still bound by the rules governing all purchases by the DAS as set out in R.C. 125.07 and, as such, is required to make all purchases except those acquired pursuant to R.C. 4115.31 and 4115.35 or equal to, or under $5,000, by competitive bidding.

R.C. 127.16(A)(3)(a) allows the Controlling Board, upon request by a state agency, to waive the competitive bidding requirements specified by law for a state agency's purchase of equipment, materials, or supplies, whose costs will amount to more than $5,000 if it determines that an emergency of sufficient economic reason exists.

As part of the original contract executed in 1979 for leasing and maintenance of the present computer system, an option was included whereby the lottery commission was given an oppor-

tunity to purchase the equipment after the contract expired in February 1983. The defendants assert that the option contract was part of the original contract actually bid upon by GIC and CDC in 1979 and, as such, need not be bid upon again. However, the option clause in the original contract only represents a binding agreement between the state and GIC that such a purchase would be acceptable to GIC if the option were exercised. It does not represent a decision by the lottery commission to make such a purchase. Any exercise of the option represents a new contractual relationship between GIC and the lottery commission and, as such, it must meet all procedural requirements for the purchase of computer equipment and technical services.

The plaintiff alleges that the lottery commission never did receive a proper release and permit from the DAS allowing them to negotiate a contract with GIC. The record reveals that a letter was sent to the executive director of the lottery commission on July 23, 1982 from the deputy director of computer services approving the lottery's request for a release and permit to contract with GIC to purchase, enhance, and facilitate the management of the existing computer system at an estimated price of $24,000,000. While the letter appears to be an after-the-fact attempt to acquire the needed release and permit, there was evidence presented to the trial court that approval of the request had been given orally before the lottery commission went before the Controlling Board with its request and that the letter was a confirmation of that previous recommendation and release from the DAS.

R.C. 125.06 states:

"* * * A release and permit for supply or equipment or contract of insurance shall specify the items of supply or equipment or contract of insurance, the office or institution to which the release and permit applies, and the time during which such release or permit is operative, and may specify the quantity of each item of supply or equipment or amount of insurance to be procured by such officer, board, or commission, and shall also state the reason for its issuance. * * * Every release and permit shall be in triplicate, one copy to be filed with the officer, board, or commission to whom it is issued, one copy to be filed with the auditor of state, and one copy to be filed with the department."

While certainly the letter sent to the lottery commission does not strictly comply with the requirements of R.C. 125.06, there is sufficient evidence to support the trial court's finding that no substantial defect could be found that would have prejudiced the rights of the plaintiff.

The plaintiff also alleges that certain defects existed in the procedures followed by the Controlling Board in its eventual approval of the lottery commission's request and, that these defects were of such a substantial nature, that the Controlling Board's actions should be declared invalid.

R.C. 127.16 states:

"(A) Upon the request of either a state agency or the director of budget and management and after the controlling board determines that an emergency or a sufficient economic reason exists, the controlling board may:

"* * *

"(3) Waive the competitive bidding requirements specified by law for a state agency's:

"(a) Purchase of equipment, materials, and supplies to cost more than five thousand dollars;"

The plaintiff asserts that no such determination was made by the Controlling Board with regard to the lottery commission's request and that, even if such a determination was made, there was no evidence upon which to support it. The plaintiff cites the testimony of George E. Lord, the president of the

Controlling Board, that no separate vote was taken by the Controlling Board to determine if an emergency of sufficient economic reason existed upon which to grant the lottery commission's request. However, the mere fact that a separate vote was never taken does not establish that such a determination was never made. There was evidence presented that such a determination was made as part of the final vote to grant or deny the lottery commission's request. Lord testified at trial, when questioned by the court:

"THE COURT: Let me ask a question.

"Would you mind telling me based upon your contact with the Board what the great emergency was and what the great economic benefit was to dispense with the competitive bidding?

"THE WITNESS: Well, those are two separate concepts.

"THE COURT: Well, I know what each of them are, but answer me on either or both of them?

"THE WITNESS: What I will say is the requests of the Board for emergency or economic reason, in this case, the economic reason was articulated by the Director of the Lottery that this particular game would generate millions of dollars to the State of Ohio.

"If competitively bid, it could risk losing tens of millions of dollars to the State of Ohio, and that became, essentially, became apparent that if there was some delay—and competitively bidding did not appear to be as good as an idea as it had been earlier, and a delay would make the economic reason more severe. It would become more severe or more difficult to change games or get a new game in place in a timely fashion, and the failure to do that would cost the State millions of dollars. If you have any concept of how much money the State of Ohio Lottery generates, you would understand why the loss would be great, even one day down."

In addition, the plaintiff contends that the procedures followed by the board during its consideration of the lottery commission's request were in violation of the procedures required by law and established by the board for its operations. While the record reveals that certain procedural steps may not have been strictly complied with, there was sufficient evidence presented to the court to support a finding that the procedures followed by the Controlling Board were not prejudicial to the rights of the plaintiff.

Pursuant to R.C. 127.13, the Controlling Board has established procedures for conducting the business of the board. However, R.C. 127.13 does not establish the content of those procedures or require strict compliance, it merely establishes the authority of the board to dictate the procedures it sees fit to follow.

R.C. 127.13 states in pertinent part:

"The controlling board may adopt procedural rules for the conduct of the business of the board, may approve, disapprove, modify as to specific dollar amounts, or defer requests * * *."

The record reveals that the lottery director orally submitted his first request for a waiver of the competitive bidding requirements and approval of the commission's contract with GIC on May 20, 1982, and that the request was placed on the agenda for the June 7 meeting of the Controlling Board. Since no written request was submitted, this violated sections IIB, IIA and IIC2 of the Controlling Board's procedures. At the June 7 meeting, the board voted six to one to defer consideration of the lottery commission's request. The lottery commission's request was then placed on the agenda for the June 21 meeting. The meeting extended into a second day and on the 22nd of June, the request was finally discussed. During their discussions, Senator Aronoff moved to amend the lottery commission's request. His

motion passed by a vote of five to one. This was done in violation of R.C. 127.13, which allows the Controlling Board to modify a request only as to the amount involved. However, the changes Aronoff sought were already contained in the contract. Therefore, his amendment was unnecessary and not prejudicial to the plaintiff. The lottery commission's request was then voted upon with a tie vote resulting (three to three).

On July 20, 1982, the lottery director again orally requested that a second request for approval be submitted to the Controlling Board for consideration at its next meeting on the 21st. The second request was identical to the first request and, as such, was alleged by the plaintiff to be in violation of several sections of the Controlling Board's procedures. While the requests were identical, testimony was given at the trial that new evidence was presented with the second request for the board's consideration. At the meeting on the 21st, the lottery commission's request was approved by a vote of four to three. Evidence was presented at the trial that the plaintiff was present at all of the hearings discussed above and was given an opportunity to present evidence in support of its position in regard to the lottery commission's request.

As cited by the plaintiff, it is clear that the Controlling Board failed to fully abide by its procedural guidelines when dealing with requests from state agencies. However, strict compliance is not the rule and, in order to prevail, the plaintiff must be able to demonstrate either that the procedural defects that occurred were so substantial that the basic integrity of the Controlling Board and its operations was threatened or that the defects were of such a nature that the plaintiff was prejudically affected. This court can find no basis upon which to support a reversal of the trial court's findings that no such defects occurred.

As stated in R.C. 127.16(B)(1):

"(B) Neither of the following acquisitions shall be made unless approved by the controlling board or unless they are competitively bid:

"(1) Acquiring from a particular supplier of professional services, technical services, and the advice of experts, or any combination thereof to cost, in the aggregate over a twelve-month period, ten thousand dollars or more;"

Since the lottery commission was requesting that the competitive bidding requirements for its contract with GIC be waived, and since the amount of the contract clearly exceeded $10,000, the contract would have to be approved by the Controlling Board before it could be executed.

The plaintiff also asserts that the lottery commission's request for approval of its new contract with GIC failed to meet the criteria established by the Controlling Board for the purchase of professional or technical services pursuant to R.C. 127.161. However, a review of the legislative history of R.C. 127.161 reveals that the statute was repealed in Am. Sub. H.B. No. 694 (effective November 15, 1981). An attempt to reenact the section in the same bill was vetoed by Governor Rhodes. In its new version, R.C. 127.161 would have placed specific limitations on the purchase of professional services by a state agency. As a result, the criteria established by the Controlling Board, while still helpful as a guide for the approval of an agency's contract for technical or professional services, are no longer required to be strictly complied with as before under R.C. 127.161.

In its fourth, fifth, sixth and seventh conclusions of law, the trial court states:

"4. Defendant, Director of the Lottery, had authority under the applicable statutes to exercise the purchase options in the Original Contract, to add enhancements to the lottery system and to

negotiate a service and maintenance contract with GIC, to submit the Lottery Request to the Controlling Board for waiver of competitive bidding and approval, and to execute the Contract after approval by the Controlling board. The Director properly exercised his statutory authority and his actions did not constitute an abuse of discretion.

"5. Defendant Controlling Board had authority under the applicable statutes, including Section 127.16, Ohio Revised Code, to waive competitive bidding and approve the Lottery Request. The Controlling Board properly exercised its authority in waiving competitive bidding and approving the Lottery Request, and its actions did not constitute an abuse of discretion.

"6. Plaintiffs have failed to establish the necessary grounds for a preliminary or permanent injunction.

"7. Plaintiffs have failed to prove any claims upon which relief can be granted under the Amended Complaint."

As to the proposition that both the lottery director and Controlling Board abused their discretion in seeking and approving the lottery commission's request, we find substantial evidence to support the trial court's determination that no such abuse occurred.

Pursuant to App. R. 18(C) and Local R. 8(D), plaintiffs-appellants and cross-appellees have moved the court to dismiss defendants-appellees and cross-appellants' cross-appeal based on their failure to file and serve a brief on their cross-appeal within the time permitted by App. R. 18(A).

In their reply brief, defendants claim that they inadvertently failed to state in their notice of cross-appeal the conditions of the appeal as required by Local R. 6(D) and had planned to submit their brief on the cross-appeal along with their reply brief in the interest of judicial economy. This is an instance where the defendants have made an ef-

fort to prosecute an appeal but have not acted diligently. In *Perry* v. *Perry* (1982), 7 Ohio App. 3d 318, the appellant erred in failing to file her brief because she believed that the time would commence from the date when the record was supplemented. We did not dismiss the appeal because we were unable to find that the appellee was prejudiced by the delay and ordered that appellant bear the costs of the action to date.

Similarly, in this case, we find no apparent prejudice as a result of the delay and, therefore, so long as defendants bear all costs of this action to date, regardless of the outcome of the appeal, the motion to dismiss is overruled.

For the foregoing reasons, all of the plaintiff's assignments of error are overruled, defendants' cross-assignment of error is sustained in part and overruled in part, and the judgment of the trial court is affirmed.

*Judgment affirmed.*

McCORMAC and NORRIS, JJ., concur.